IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH iCLOUD ACCOUNT biggplay100@icloud.com THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC. | Case No. 3:24-mj-34/HTC<br><br>__Filed Under Seal__ |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jarrett L. Swearingen, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and information, including the contents of communications, associated with Apple ID: **biggplay100@icloud.com** ("TARGET ACCOUNT"), that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.     Your Affiant is a Special Agent with the Drug Enforcement Administration ("DEA") and has been so employed since October 2016.  Your affiant is currently assigned to the Pensacola Resident Office, charged with investigating drug trafficking and money laundering violations under Titles 18 and 21 of the United States Code.  Your affiant has received 20 weeks of specialized training in Quantico, Virginia, pertaining to drug trafficking, money laundering, undercover operations and electronic and physical surveillance procedures.  Before becoming a

FILED USDC FLND PN
FEB 2 '24 AM10:56

Special Agent with the DEA, your affiant was employed by the Escambia County, Florida, Sheriff's Office for approximately seven years. Of those seven years, your affiant spent approximately four years in a narcotics unit where your affiant was charged with investigating drug-trafficking violations under the Florida State Statutes. Your affiant has been involved in numerous investigations dealing with the possession, manufacture, distribution, and importation of controlled substances.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Rayvaughn ANDREWS has (and continues to) unlawfully conspired to distribute a controlled substance, in violation of Title 21, United States Code, Section 846; possessed with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(a)(1); conducted financial transactions with proceeds from a specified unlawful activity with specific intent to conceal or disguise the source, origin or nature of the proceeds in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and engaged in a monetary transaction with proceeds of an specified unlawful activity in an amount greater than $10,000 by, through, or to a financial institution in violation of Title 18, United States Code, Section 1957(a). There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

2

## PROBABLE CAUSE

5.      During December 2021, members of the Drug Enforcement Administration, Internal Revenue Service – Criminal Investigation ("IRS-CI"), and the Escambia County Sheriff's Office ("ECSO") initiated an investigation into the drug trafficking and money laundering activities of Rayvaughn ANDREWS.

6.      The investigation revealed that at least since 2021 through 2023, ANDREWS has significant gaming activity at casinos in Mississippi, as well as Nevada, that is not supported by the amount of income he has reported to the IRS and the lack of wages and earnings reported to Florida Department of Revenue ("FDOR").

7.      ANDREWS's activity in casinos is regularly captured by Currency Transaction Reports (CTRs) in which there are one or multiple transactions that aggregate to an amount over $10,000 in a 24-hour period. In 2021, ANDREWS had 212 CTRs totaling approximately $4,215,729 cash in and $4,035,771 cash out. In 2022, ANDREWS had 124 CTRs totaling approximately $2,181,322 cash in and $2,106,545 cash out.   In 2023, ANDREWS had approximately 116 CTRs totaling approximately $2,045,764 cash in and $2,058,330 cash out. In addition, from at least October 2021 through February 2023, ANDREWS posted pictures of his sports wagers on social media and claimed he is a professional gambler.

8.      In May of 2023, law enforcement received information from a casino in Mississippi. The casino records indicated that between July 11, 2020, and April 26, 2023, ANDREWS placed a total of 3,369 wagers ranging in amounts from $10 to $30,000 totaling $9,720,324.50, which resulted in a loss of $516,771. Due to a lack of information related to ANDREWS's income, the casino made a source of funds request to ANDREWS, and he provided the casino with a 2021 IRS Form 1040 showing $36,655 in income. The casino deemed

3

this to be insufficient and suspicious for the amount that he was gambling and banned ANDREWS from sports betting at all of its locations.

9.      IRS records obtained by law enforcement by Orders of the Court revealed no returns filed for ANDREWS for tax years 2021 or 2022 as of the dates of the Orders.  FDOR records show ANDREWS has not had earnings or wages since 2004. The lack of records, along with the large losses that ANDREWS has incurred over several years, leads law enforcement to believe that ANDREWS attempts to conceal the nature of drug proceeds by portraying himself as a professional gambler when really laundering illicitly derived drug proceeds through the casinos.

10.     Confidential Source 1 ("CS1") provided information that, according to individuals familiar with the situation, ANDREWS, a.k.a "Bigg Play" is an owner of Club Climax in Pensacola, Florida. CS1 knows ANDREWS as "Rayshun Lewis" or "Bigg Play" due to ANDREWS using "Rayshun Lewis" or "Bigg Play" as his name on Facebook and Instagram. Another confidential source, CS3, provided information to law enforcement that on several occasions individuals were seen giving ANDREWS bags of cash at Club Climax. ANDREWS would then hand the bags of cash to his girlfriend, Alexis WILRIDGE, who would take the bags to her car. Florida Department of Corporations records show that, in 1999, Patrina MOYE ("MOYE") established Players Package and Lounge, Inc., that currently does business as Club Climax. Businesses in the State of Florida are required to file quarterly employer reports with FDOR and pay reemployment taxes on wages paid to employees. A query of FDOR records showed that Players Package and Lounge has not filed any quarterly employer's tax reports. Based on this information, law enforcement believes that MOYE is a nominee owner of Players

Package and Lounge d.b.a. Club Climax for ANDREWS, and that ANDREWS has been using Players Package and Lounge doing business as Club Climax as a front to launder drug proceeds.

11.    On August 22, 2023, your affiant, along with multiple federal and local law enforcement agencies, conducted an operation that consisted of several search warrants and arrests after the conclusion of a court authorized interception of communications involving Ainsley BROWN and Ramon SINGLETON. As a result of this investigation, BROWN and SINGLETON were arrested for conspiracy to traffic cocaine and conspiracy to commit money laundering. SINGLETON's residence, located at 745 Alfonso Street in Pensacola, Florida, was also searched as a result of court authorized search warrants. Approximately 500 grams of cocaine and a firearm were located at SINGLETON's residence. SINGLETON was transported to the Escambia County Sheriff's Office, where your affiant conducted an interview with SINGLETON.

12.    Prior to the interview, your affiant advised SINGLETON of his *Miranda* rights, at which time SINGLETON agreed to speak with investigators without an attorney present. SINGLETON stated that he would purchase kilogram quantities from ANDREWS for approximately $20,000 - $21,000. SINGLETON stated that ANDREWS would not sell less than 1 kilogram and would require cash payments upfront. SINGLETON stated that ANDREWS would not typically talk about the sale over the phone and would prefer to discuss it in person. SINGLETON would meet ANDREWS at 8611 Fab Street in Pensacola, Florida, to conduct transactions. SINGLETON stated that he purchased cocaine from Andrews 3 or 4 times in the last year. SINGLETON stated that ANDREWS is currently trafficking approximately 20 kilograms of cocaine each week, however, SINGLETON does not have any knowledge of

ANDREWS's source of supply. SINGLETON provided telephone number (850) 549-5417 as the number that SINGLETON would use to contact ANDREWS.

13.    On October 31, 2023, agents conducted an interview of Ainsley BROWN. BROWN stated that he has known ANDREWS since 2015 or 2016, when he got out of prison. BROWN stated that he has purchased cocaine from ANDREWS on multiple occasions and about 3 or 4 times in the past year. BROWN stated that he only communicated with ANDREWS through Facebook Messenger or SnapChat. BROWN further stated that he would meet ANDREWS in the parking lot of Club Climax when conducting drug transactions.

14.    In October 2023, law enforcement began receiving court authorized GPS location data from ANDREWS's cell phone. The GPS location data confirmed that ANDREWS is frequenting a casino in Mississippi. ANDREWS has made multiple trips to this casino each week and stayed at the location for multiple hours before returning to his residence. Information was provided to law enforcement from this casino, which included information from ANDREWS's player account. ANDREWS provided the casino with the email address **biggplay100@icloud.com.** Your affiant believes that the casino sent various information, including sports bet confirmations with laundered money, to this iCloud account and therefore it contains relevant evidence.

15.    Your affiant was able to locate the Facebook profile **rayshun.lewisii** for ANDREWS. Your affiant observed the profile photo to be a picture of ANDREWS with music artist Lil' Wayne. Through the photos for this profile, your affiant observed numerous other photos of ANDREWS. ANDREWS listed his occupation on the profile as "Entrepreneur" and tagged his Instagram account "BiggPlayEntertainment New Page! Instagram Go Follow @BiggPlay." Your affiant also observed a large amount of Facebook wall posts promoting Club

Climax. Your affiant also observed posts discussing gambling on sporting events, which your affiant believes ANDREWS is doing in an attempt to launder drug proceeds. Below are screenshots taken from Facebook profile **rayshun.lewisii.**



16.    Using the link on ANDREWS's open Facebook profile, your affiant was able to locate ANDREWS's Instagram profile **@biggplay**. On this profile, ANDREWS claims to be a "Gulf Coast Concert & Club Promoter/Professional Sports Handicapper."  ANDREWS also provided a link to his alternate Instagram profile "**@biggplay_da_locksmith.**"  The most recent photograph on the open profile is a photograph of ANDREWS sitting in a black vehicle holding what appears to be approximately $20,000 United States currency bundled into two $10,000 bundles. Your affiant also observed other photographs of ANDREWS holding large stacks of United States currency as well as numerous promotional photos for Club Climax. ANDREWS listed the email address **biggplay100@icloud.com** as a contact for both Instagram accounts, **biggplay** and **biggplay_da-Locksmith.**

17.    Below are screenshots taken from Instagram profile **BiggPlay**.



18.    Using the link on ANDREWS Instagram profile **biggplay**, your affiant located the alternate Instagram profile **biggplay_da_locksmith.** The profile photograph for this profile was a photograph of ANDREWS. Your affiant observed photographs of gambling receipts between September 28, 2021, and March 17, 2023. These photographs showed details of ANDREWS's gambling activity to include the date, event gambled on, and amount of currency gambled. Between these dates, ANDREWS posted approximately 61 photographs of gambling tickets, which totaled approximately $625,537.24 that were placed as bets. In addition to these photographs, your affiant also observed several other photographs of ANDREWS. Below are screenshots taken from Instagram Profile **biggplay_da_locksmith.**



19.    On or about December 4, 2023, United States Magistrate Judge Hope Thai Cannon authorized a search warrant for the Instagram accounts **Biggplay** and **Biggplay_da_locksmith**. Both accounts were determined to be under the control of ANDREWS and utilized ANDREWS's iCloud email address **biggplay100@iCloud.com,** which creates a fair probability that evidence is retained within said iCloud account because it is backing up the images captured and later posted on social media. Your affiant reviewed the data provided by Meta in response to this Instagram search warrant. Upon review, your affiant discovered that ANDREWS provided different phone numbers to individuals upon request. These phone numbers would frequently change, and ANDREWS would provide different phone numbers to different people depending on the reason for the contact. Your affiant, knows through training and experience, that narcotics traffickers often maintain multiple phones and phone numbers to separate various aspects of their lives, such as narcotics trafficking, family, and legitimate business ventures. Due to these conversations, your affiant now knows that ANDREWS

maintains multiple cellular telephones. Your affiant also observed multiple communications within the private messages section of the Instagram account "**Biggplay**," which were indicative of narcotics trafficking. Below are some examples confirming the illicit activity of ANDREWS.

20.     On January 12, 2022, Instagram account "lilone119" sent a video of what appeared to be a large quantity of marijuana to ANDREWS. The rest of the conversation was as follows:

ANDREWS:   (sent a "fire" emoji)

ANDREWS:   "How much for them"

lilone119:    "They say 5"

ANDREWS:   "$500"

lilone119:    "Yeah but its just bubba tho. But they got other shit too"

ANDREWS:   "Man that's what everyone but that's what we need to sell"

ANDREWS:   "I'll grab a 100 of them"

21.     Based on your affiant's training and experience, and the context of this conversation, your affiant believes that "lilone119" sent the video of suspected marijuana to ANDREWS to see if ANDREWS was interested in purchasing any. "lilone119" told ANDREWS that the source of the marijuana is charging "5," referring to $500.00 per pound of marijuana, which is the going rate per pound for bulk purchases of marijuana. ANDREWS responded to "lilone119" by stating that is what ANDREWS needs to sell and stated that he will "grab a 100 of them," which your affiant believes is referring to 100 pounds of marijuana. Furthermore, your affiant was able to identify the owner of the Instagram profile "lilone119" as Trenton COPELAND through various photographs on the account as well as an email address of

trentoncopeland20@gmail.com, which was provided by "lilone119" on November 18, 2021, to ANDREWS.  COPELAND is a federally convicted drug trafficker who was released from the Bureau of Prisons.

      22.    Between June 1, 2021, and June 23, 2021, ANDREWS had the following text message conversation with Instagram user "shameless_43ver":

| | |
|---|---|
| shameless_43ver: | "Yo" |
| shameless_43ver: | "U back" |
| ANDREWS: | "Tomorrow" |
| shameless_43ver: | "Ight" |
| shameless_43ver: | "Let me know wassup" |
| ANDREWS: | "I got 1" |
| ANDREWS: | "Ticket 38" |
| shameless_43ver: | "That's to high big brah" |
| shameless_43ver: | "Big bro no disrespect but I'm not a duck" |
| ANDREWS: | (Sunglasses emoji) |
| shameless_43ver: | "I'll give you 37 for it if you willing to take that bro but bro I'm no peewee in dis shit if I had the resources anybody else had or yourself I would had been gone out this bih but fwm we you really wanna handle sum business big bro (sunglasses emoji)" |
| ANDREWS: | "I been gone bro ion need yo money I just do this my people ion need this shit I'm straight" |
| shameless_43ver: | "Ticket change yet" |
| shameless_43ver: | "If price is right I'll grab 4 of em" |
| ANDREWS: | "36 for 4 VipTickets" |

| | |
|---|---|
| shameless_43ver: | "I can't get for at least 35.5 on a deal" |
| ANDREWS: | "Man might do that for you I can't" |
| ANDREWS: | "Holla at him" |
| shameless_43ver: | "Man who" |
| ANDREWS: | "Eress Man" |
| ANDREWS: | "AWA MAN" |

23.    Based on your affiant's training and experience, and the context of the conversation, your affiant believes that "shameless_43ver" was contacting ANDREWS in order to purchase cocaine from ANDREWS. Your affiant believes that ANDREWS used the term "ticket" as a code for kilogram of cocaine. Furthermore, your affiant believes that the price of "38" and "36" refers to $36,000-$38,000 for one kilogram of cocaine, which is consistent with the price of 1 kilogram of cocaine in 2021. "shameless_43ver" then attempted to purchase "4," referring to 4 kilograms of cocaine from ANDREWS, however, the two cannot agree on the price at which time ANDREWS turns "shameless_43ver" to another suspected drug trafficker.

24.    Additionally, your affiant observed a text message conversation between ANDREWS, using Instagram account "**biggplay**," and Instagram account "rollsroycebuddah" occurring on March 1, 2021. The conversation was as follows:

| | |
|---|---|
| rollsroycebuddah: | "You stop Fw The Other?" |
| ANDREWS: | "I gotta pay my people before I can get some more you owed me and then lil money got killed owing me put me in the hole with the plug" |
| rollsroycebuddah: | "I Gotta Think Of A Master Plan To Get Me A ID & Social Security Card So I Can Send It To The Bank Then I Can Get That Money" |

25.    Based on your affiant's training an experience, and the context of the conversation, your affiant believes that "rollsroycebuddah" asked if ANDREWS still sold cocaine, and ANDREWS responded by informing "rollsroycebuddah" that he owed the source of supply money, causing ANDREWS to not be able to obtain that specific controlled substance at that time.

26.    Based on the above statements from confidential sources and cooperating defendants, financial records, open source information gathered from ANDREWS's Facebook and Instagram accounts, as well as the text messages conversations obtained from ANDREWS's Instagram accounts, your affiant believes that ANDREWS is involved in the sale of controlled substances to included marijuana and cocaine. Your affiant also believes that other photos, videos, and other digital documentation will be stored within ANDREWS's **biggplay100@iCloud.com** account, which is directly linked to these illicitly utilized social media accounts. This is particularly true because Apple maintains records and data as noted below based upon cloud storage capabilities.

### BACKGROUND CONCERNING APPLE SERVICES

27.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.  iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit

14

card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.  Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.  App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

28.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

29.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a

third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

30.    Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

31.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service,

16

including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

32.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

33.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service

("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

34.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

35.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

36.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant

18

time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

37.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

39.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

19

**CONCLUSION**

40.    Based on the foregoing, I request that the Court issue the proposed search warrant.

41.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Apple.  Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

42.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**REQUEST FOR SEALING**

43.     Your Affiant further requests that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jarrett L. Swearingen
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this 2nd day of February 2024, in Pensacola, Florida.

Hope Thai Cannon
United States Magistrate Judge

21